[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 275 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 276 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 277 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 278 
The appellant, Kenneth Eugene Smith, was convicted of murdering Elizabeth Dorlene Sennett for a pecuniary or other valuable consideration, an offense defined as capital by § 13A-5-40(a)(7), Ala. Code 1975. The jury, by a vote of 11 to 1, recommended that Smith be sentenced to life imprisonment without the possibility of parole. The trial court, pursuant to authority granted by §13A-5-47(e), Ala. Code 1975, overrode the jury's recommendation and sentenced Smith to death.[1] *Page 279 
The State's evidence tended to show the following. On March 18, 1988, the Reverend Charles Sennett, a minister in the Church of Christ, discovered the body of his wife, Elizabeth Dorlene Sennett, in their home on Coon Dog Cemetery Road in Colbert County. The coroner testified that Elizabeth Sennett had been stabbed eight times in the chest and once on each side of the neck, and had suffered numerous abrasions and cuts. It was the coroner's opinion that Sennett died of multiple stab wounds to the chest and neck.
The evidence established that Charles Sennett had recruited Billy Gray Williams,[2] who in turn recruited Smith and John Forrest Parker,[3] to kill his wife. He was to pay them each $1,000 in cash for killing Mrs. Sennett. There was testimony that Charles Sennett was involved in an affair, that he had incurred substantial debts, that he had taken out a large insurance policy on his wife, and that approximately one week after the murder, when the murder investigation started to focus on him as a suspect, Sennett committed suicide. Smith detailed the following in his confession to police:
 "About one month prior to March 18, 1988, I was contacted by Billy Williams. Billy came over to my house and we talked out on the front porch. It was late afternoon. Billy said that he knew someone that wanted somebody hurt. Billy said that the person wanted to pay to have it done. Billy said the person would pay $1500 to do the job. I think I told Billy I would think about it and get back with him. Billy lives at the corner of Tuscaloosa Street and Cypress Street near the telephone company. Billy drives a red and white Thunderbird. Billy and I are good friends. Billy and I talked about this several times before I agreed to do it. I had already talked with John Parker about helping me.
 "I think I first met Charles Sennett about two weeks prior to the murder. Billy arranged the meeting. At the time I met Mr. Sennett I did not know who he was. I did not ask his name and he did not ask what my name was. Mr. Sennett told me that he wanted somebody taken care of. Mr. Sennett said that the person would be at home, that they never had any visitors. Mr. Sennett said that the house was out in the country. At that time I just listened to his proposal and told him I would get back with him. When we talked we sat in Mr. Sennett's truck in front of Billy's apartment. I gave him my phone number.
 "Mr. Sennett called me a couple of times to see if I had made a decision. Sometime between the Monday prior to the murder and the Thursday prior to the murder, Mr. Sennett learned that John and I would do what he wanted. I met with Mr. Sennett on Tuesday prior *Page 280 
to the murder in the coffee[house] at ECM. At this meeting Mr. Sennett drew me a diagram of his house and told me that his wife and he would be out of town on Wednesday, to go down to the house and look around. By the time Sennett and I met at ECM I had learned through conversations with him that it was his wife that he wanted killed and the price agreed was $1,000 each — excuse me — $1,000 each for Billy Williams, John Parker and I.
 "The next meeting was on Thursday prior to the murder in front of Billy's apartment again. Billy, Mr. Sennett and I sat in Mr. Sennett's silver car and talked. I don't recall what time it was exactly. I think it was in the morning. At this meeting Sennett gave me $200 and showed us the rest of the money. Two hundred dollars was for anything we needed to do the job. John Parker sat in my car while Billy and I talked with Mr. Sennett. The murder was supposed to look like a burglary that went bad. This was Mr. Sennett's idea. Sennett told me to take whatever I wanted from the house. It was agreed for John and I to do the murder and then come back to Billy's apartment — to Billy's house — excuse me — and get the rest of our money. This meeting only lasted a short while. Sennett told us that he would be gone from 8:30 until noon. Then on 3/18 of '88 . . . Friday, John and I got together around 8:30. We were in John's car, a Pontiac Grand Prix, gold. John drove to Muscle Shoals, then I drove down to the Sennett house. John had brought a black handle survival knife and a black holster. At this time we still did not know how we were going to kill Mrs. Sennett.
 "John and I got to the Sennett house around 9:30, I think. I parked at the back of the house near a little patio that led into the house. I went to a door to the left of the car. I think there was a white freezer nearby. I knocked on the door and Mrs. Sennett came to the door. I told Mrs. Sennett that her husband had told us that we could come down and look around the property to see about hunting on it. Mrs. Sennett asked my name. I told her I was Kenny Smith. She went to the phone and called her husband and came back and told us it was okay to look around.
 "John and I looked around the property for a while then came back to the house. John and I went back to the door. We told Mrs. Sennett we needed to use the bathroom and she let us inside.
 "I went to the bathroom nearest the kitchen and then John went to the bathroom. I stood at the edge of the kitchen talking with Mrs. Sennett. Mrs. Sennett was sitting at a chair in the den. Then I heard John coming through the house. John walked up behind Mrs. Sennett and started hitting her. John was hitting her with his fist. I started getting the VCR while John was beating Mrs. Sennett. John hit Mrs. Sennett with a large cane and anything else he could get his hands on. John went into a frenzy. Mrs. Sennett was yelling just stop, we could have anything we wanted.
 "As John was beating up Mrs. Sennett, I messed up some things in the house to make it look like a burglary. I took the VCR out to the car.
 The last place I saw Mrs. Sennett she was lying near the fireplace covered with some kind of blanket. I had gone outside to look in the storage buildings when I saw John run out to the pond and throw some things in it. I also took a small stereo from the house — `also,' is the last word. *Page 281 
 "I don't know what brand it was or where in the house I got it. The VCR was a Samsung. I got it from under the TV set in the den. When John got back to the car we drove back to Billy's apartment to get our money.
 "On the way back John told me that he had stabbed her once in the neck. I never stabbed Mrs. Sennett at all. When John and I got to Billy's, we were given $900 a piece. Billy gave us the money.
 "At the time of the murder I never [knew] Charles Sennett's name or his wife's. It was only when it came out in the newspaper that I learned the name of the lady that was killed and Charles Sennett.
 "I took the Samsung VCR home with me. The last time I saw the stereo it was in John's car. It was around noon when we got to Billy's apartment. Then on 3/31/88 — in parenthesis, Thursday — my house was searched by investigators and they found the VCR. I was brought to the Colbert County Courthouse where I was advised of my rights. After being advised of my rights, I gave Investigator May this written statement."
Smith's statement to police was corroborated at trial. Donald Buckman, a friend of Smith's, testified that Smith approached him about one week before the murder and asked him if he would be interested in participating in beating someone up in exchange for money. Another witness, Brent Barkley, testified that Smith told him that he had been hired to beat up someone. Barkley also stated that he saw Smith on the evening of the murder and that Smith's hand was "bruised and wrapped." There was also testimony that Smith had in his possession a large amount of money immediately after the murder.
Smith's defense at trial was that he participated in the assault of Elizabeth Sennett but that he did not intend to kill her. Counsel in opening statement stated the following:
 "[Smith] agreed with Sennett to go beat Elizabeth Dorlene Sennett, to rough her up, to make it look like a robbery for fast cash. That is the terms they used. It was not to kill Mrs. Sennett. It was not to take her life. As shameful and as vile, it was nothing more or nothing less than to beat her up and to take [sic]. And that plan, what they agreed to — and you will hear evidence of this — that as evil as that plan was, that is all it was."
 Standard of Review
Smith has been sentenced to death. Pursuant to Rule 45A Ala.R.App.P., this Court must review the record of the trial proceedings to determine if there is plain error. Rule 45A states:
 "In all cases, in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
As this Court stated in Jackson v. State, 791 So.2d 979,991-92 (Ala.Crim.App. 2000):
 "`Plain error' has been defined as error `so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' Ex parte Womack, 435 So.2d 766, 769
(Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir. 1981). `To rise to the level of plain error, the claimed error must *Page 282 
not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So.2d 199 (Ala.Cr.App. 1998). This court has recognized that `"the plain error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'"' Burton v. State, 651 So.2d 641, 645 (Ala.Cr.App. 1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting in turn, United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816
(1982))."
While the failure to object does not bar our review in a death penalty case, it weighs against any claim of prejudice. Ex parteKennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975,106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
 Guilt-Phase Issues I.
Smith argues that his constitutional rights were violated by the district attorney's refusal to enter into good-faith plea negotiations. Specifically, Smith argues that the district attorney wrongfully allowed the victim's family to have input in whether the State would negotiate a plea agreement with Smith.
Initially, we observe that the only mention of Smith's entering a guilty plea is contained in the motion for a new trial, which states as follows:
 "Mr. Smith's rights to equal protection, due process, and a reliable determination of sentence, pursuant to Article I, Sections 1, 6, 8, 11, and 15 of the Alabama Constitution, the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and other applicable law, were violated by the District Attorney's refusal to enter into good faith plea negotiations with the defense, by the prosecutor's unfair and discriminatory plea bargaining policies, and by the prosecutor's improper delegation of prosecutorial responsibility. Mr. Smith's sentence of death must be set aside and a sentence of life in prison without the possibility of parole must be entered."
At the motion hearing Smith made no mention of this contention. The record contains no other reference to any attempted plea negotiations or any reference as to why these alleged attempts failed. As this Court has often stated:
 "`This court is bound by the record and not by allegations or arguments in brief reciting matters not disclosed by the record.' Webb v. State, 565 So.2d 1259, 1260 (Ala.Cr.App. 1990). See also Acres v. State, 548 So.2d 459 (Ala.Cr.App. 1987). Further, we cannot predicate error from a silent record. Owens v. State, 597 So.2d 734 (Ala.Cr.App. 1992); Woodyard v. State, 428 So.2d 136 (Ala.Cr.App. 1982), aff'd, 428 So.2d 138 (Ala.), cert. denied, 462 U.S. 1136, 103 S.Ct. 3120, 77 L.Ed.2d 1373 (1983)."
Whitley v. State, 607 So.2d 354, 361 (Ala.Crim.App. 1992). See also Taylor v. State, 808 So.2d 1148, 1177 (Ala.Crim.App. 2000).
Moreover, as the United States Supreme Court stated inWeatherford v. Bursey, 429 U.S. 545, 561, 97 S.Ct. 837,51 L.Ed.2d 30 (1977), "[t]here is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial. It is a novel argument that constitutional rights are infringed by trying the defendant rather than accepting his plea of guilty." See also Ex parte Pfalzgraf, 741 So.2d 1118
(Ala.Crim.App. 1999), and Murray *Page 283 v. State, 494 So.2d 891 (Ala.Crim.App. 1986).
 II.
Smith argues that the trial court committed reversible error in refusing to strike for cause prospective juror E.K. on the basis that he indicated during voir dire that he thought the death penalty should be imposed more often. Smith further argues that E.K. should have been struck because he stated that he did not consider age to be a mitigating factor. We note that Smith used his first peremptory strike to remove E.K. from the venire.
A review of the record reflects that E.K. indicated during general voir dire questioning that he thought that the death penalty should be imposed more frequently. Because of that answer E.K. was individually voir dired, in chambers, by the defense and prosecution. E.K. was questioned in depth about his views regarding capital punishment and indicated, on more than one occasion, that he could set aside his personal views and follow the law as instructed by the court. He also said that he would be fair to the defense.
This Court in Pressley v. State, 770 So.2d 115, 127
(Ala.Crim.App. 1999), aff'd, 770 So.2d 143 (Ala. 2000), stated:
 "The `original constitutional yardstick' on this issue was described in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Under Witherspoon, before a juror could be removed for cause based on the juror's views on the death penalty, the juror had to make it unmistakably clear that he or she would automatically vote against the death penalty and that his or her feelings on that issue would therefore prevent the juror from making an impartial decision on guilt. However, this is no longer the test. In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that the proper standard for determining whether a veniremember should be excluded for cause because of opposition to the death penalty is whether the veniremember's views would `"prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."'"
The thorough voir dire of this juror indicates that his views on capital punishment would not interfere with his duty as a juror. The trial court correctly denied Smith's strike for cause of E.K.
Moreover, any possible error was harmless based on the United States Supreme Court's recent holding in United States v.Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792
(2000). In Martinez-Salazar, the Court held that a defendant's right to an impartial jury is not violated when a trial court fails to grant a strike for cause of a juror who is ultimately removed from the venire by the use of a peremptory strike. SeeEvans v. State, 794 So.2d 411 (Ala. 2000). The jury did not recommend that Smith be sentenced to death. The jury, by a vote of 11 to 1, recommended that Smith be sentenced to life imprisonment. According to Martinez-Salazar, Smith was not denied his right to an impartial jury; moreover he was not prejudiced.
 III.
Smith argues that the trial court erred in allowing into evidence photographs of the crime scene and autopsy that were, he argues, unduly gruesome and unnecessarily prejudicial.
This identical issue was addressed by this Court after Smith's original conviction for capital murder. In that opinion, we stated: *Page 284 
 "`Photographs are admissible into evidence within the discretion of the trial judge and will be reviewed on appeal only to determine if there has been an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973).
 "`Photographs are admissible if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered. Baldwin v. State, 282 Ala. 653, 213 So.2d 819 (1968). The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Magwood v. State, 494 So.2d 124
(Ala.Cr.App. 1985), aff'd, Ex parte Magwood, 494 So.2d 154 (Ala. 1986), cert. denied, Magwood v. Alabama, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599
(1986).
 "`Some of the photographs in issue here depicted wounds to the back and neck area of the deceased. The State argues that the photographs were credible evidence for the jury to view in order to determine whether a pocketknife or a larger knife that was found at the scene could have inflicted the depicted wounds. Based on the record, we agree.
"`. . . .
 "` . . . [P]hotographs depicting the character and location of wounds on a deceased's body are admissible even though they are cumulative and are based on undisputed matters. Magwood[ v. State], 494 So.2d [124] 141 [(Ala.Cr.App. 1985)]. The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Id. Also a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury. Id.'
"Ex parte Bankhead, 585 So.2d 112 (Ala. 1991)."
Smith v. State, 588 So.2d 561, 579-80 (Ala.Crim.App. 1991), on remand, 620 So.2d 727 (Ala.Crim.App.), on remand, 620 So.2d 732
(Ala.Crim.App. 1992). We agree with this court's earlier determination that the photographs corroborated Smith's confession and that they were relevant and admissible.
 IV.
Smith argues that the prosecution violated Brady v. Maryland,373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose the name of the confidential informant who aided police in the investigation of the case. He further asserts that police had a duty to obtain the informant's identity.
The record reflects that after Sennett's murder, the State offered a $10,000 reward for information concerning Sennett's death. Capt. Ronnie May of the Colbert County Sheriff's Department testified that an anonymous caller contacted the Crimestoppers program telephone number for the sheriff's department and said that she had information about the Sennett murder. She told police that she wanted to remain anonymous and that she would not give any information unless she did not have to disclose her name or testify at trial. She was assigned a number, 569S, and told to give the police this number whenever she called. May testified that the caller told police that three people — Smith, Parker, and Williams — were involved in the murder, she gave their addresses, the makes of their cars, and said that a VCR that had been taken from the Sennett's house was in Smith's house and that Parker had a knife. She said that Smith participated in the murder and that he did so for money *Page 285 
and that Parker actually stabbed Sennett. May said that Caller 569S telephoned police several times to relay information. During the last telephone conversation she told police the identification number of the VCR stolen and gave a description of it to police.[4] May stated that he then applied for a warrant to search Smith's house. May further testified that the police never knew the caller's identity.
Smith argued at trial that the police had a duty to discover the identity of this caller and to give this information to defense counsel. However, as the Court of Appeals of Nebraska stated in State v. Brown, 5 Neb.App. 889, 567 N.W.2d 307
(1997):
 "People v. Callen, 194 Cal.App.3d 558, 239 Cal.Rptr. 584 (1987), involved a `Crimestoppers' program in which an anonymous caller provided the license plate number of a vehicle involved in a robbery. In Callen, the police did not know the person's identity, and the defendant's motion to compel disclosure was denied. The defendant's motion to dismiss, claiming denial of a substantial right by virtue of police conduct which allowed a witness to remain unidentified, was also denied. The defendant's conviction was affirmed on appeal after the court concluded that the police did not have a duty to determine and disclose the informant's identity. It reasoned:
 "`Such an investigatory burden would not only be onerous and frequently futile, it would destroy programs such as Crimestoppers by removing the guarantee of anonymity. Anonymity is the key to such a program. It is the promise of anonymity which allays the fear of criminal retaliation which otherwise discourages citizen involvement in reporting crime. In turn, by guaranteeing anonymity Crimestoppers provides law enforcement with information it might never otherwise obtain. We are satisfied the benefits of a Crime-stoppers-type program — citizen involvement in reporting crime and criminals — far outweigh any speculative benefits to the defense arising from imposing a duty on law enforcement to gather and preserve evidence of the identity of informants who wish to remain anonymous.'
"Id. at 563, 239 Cal.Rptr. at 587.
 "The Callen court indicated that this was the proper result even in the event that the informant was a percipient witness. It was careful, however, to distinguish cases involving Crimestoppers-type tipsters from those involving informants employed by police, taking direction from police, or having any face-to-face contact with police.
 "People v. Siegl, 914 P.2d 511 (Colo.App. 1996), involved a `Crimestoppers' report from an anonymous caller. The informant in Siegl told police that she had been in the defendant's house, and that she had smelled a strong odor of marijuana, and that the defendant's tenant had told her the defendant and the tenant grew marijuana in the house. After verifying some of the information, police obtained a search warrant for the house, and the defendant was charged with possession and cultivation of controlled substances. Before trial, the defendant sought a court order requiring the State to disclose the informant's identity. Following in camera hearings, the defendant's motions in this regard were denied. On appeal, the defendant asserted that the court erred in refusing to require the State to disclose the identity of the alleged anonymous informant to help him prepare his defense. Noting *Page 286 
that disclosure of informants was committed to the sound discretion of the trial court, the Siegl
court concluded that `the trial court did not abuse its discretion in considering the fact that the Crimestoppers' informant was unknown to the police and in concluding that such anonymity served an important public interest which outweighed the defendant's request for disclosure.' Id. at 516. Thus, it upheld the court's denial of the defendant's request for disclosure."
Police are not obligated to disclose the name of an anonymous caller who contacts a Crimestoppers program telephone number. To make such a requirement would defeat the purpose of such a program.
Moreover, there is absolutely no evidence that any Brady
violation occurred. In order to establish a Brady violation, the party alleging the violation must show: (1) that the prosecution suppressed evidence; (2) that the evidence suppressed was favorable to the accused; and (3) that the evidence was material. See Kinder v. State, 515 So.2d 55 (Ala.Crim.App. 1986). Smith cannot satisfy this test because there is no dispute that the State did not know the identity of the anonymous caller.
 V.
Smith argues that the trial court erred in denying his motion to suppress evidence, specifically, the VCR recovered from his home as the result of the execution of a search warrant. Smith argues that the VCR should have been suppressed because, he says, the informant who told police where the VCR was located was acting as an agent of the State when she entered the home. He further asserts that the search was unlawful because, he says, police exceeded the scope of the warrant.
 A.
Smith argues that police encouraged informant 569S to search Smith's home for the VCR stolen during the course of the murder; therefore, he argues, 569S became an agent for the State when she searched his home and his Fourth Amendment rights were violated.
First, we must determine if the informant was acting as an agent of the State when she entered Smith's home. The test to be applied was discussed by the Alabama Supreme Court in Ex parteHilley, 484 So.2d 485, 490 (Ala. 1985), where the court stated:
 "Mere antecedent contact between [the informant] and police did not make [the informant] an agent of the police. United States v. Lambert, 771 F.2d 83, 89
(6th Cir. 1985); Singleton v. State, 48 Ala.App. 157, 160, 262 So.2d 772, 775 (1971), cert. denied, 288 Ala. 751, 262 So.2d 776 (1972).
 "First, the police must have instigated, encouraged, or participated in the search. Second, the individual must have engaged in the search with the intent of assisting the police in their investigation. Lambert, 771 F.2d at 89; Black, 767 F.2d at 1339; United States v. Howard, 752 F.2d 220, 227 (6th Cir. 1985)."
Alabama does not have many opinions applying this test, so we have looked to other jurisdictions for guidance. The United States Court of Appeals for the Seventh Circuit stated in UnitedStates v. Feffer, 831 F.2d 734, 737-39 (7th Cir. 1987):
 "Though individuals have a fourth amendment right to be free from unreasonable searches and seizures by the government, purely private searches are not subject to constitutional restrictions. Walter v. United States, 447 U.S. 649, *Page 287 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980); Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048
(1921). `The exclusionary rules were fashioned "to prevent, not repair," and their target is official misconduct.' Coolidge v. New Hampshire, 403 U.S. 443, 488, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971) (quoting Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960)). A difficult issue arises, however, once the government is contacted by a private searcher. The government may not do, through a private individual, that which it is otherwise forbidden to do. Accordingly, if in light of all the circumstances a private party conducting a search must be regarded as an instrument or agent of the government, the fourth amendment applies to that party's actions. Coolidge, 403 U.S. at 487, 91 S.Ct. at 2048.
". . . .
 "In addressing this issue, the district court followed the approach taken by the Ninth Circuit in United States v. Walther, 652 F.2d 788 (9th Cir. 1981). Though specifically declining to define a standard, id. at 791, the Walther court approached the `instrument or agent' issue by considering both whether the government knew of and acquiesced . . . and whether . . . the search [was conducted] . . . for the purposes of assisting the government.
". . . .
 ". . . [T]wo critical factors in the `instrument or agent' analysis are whether the government knew of and acquiesced in the intrusive conduct and whether the private party's purpose for conducting the search was to assist law enforcement efforts or to further her own ends. The court's analysis must be made on a case-by-case basis and in light of all the circumstances. Nevertheless, it is the movant's burden to establish by a preponderance of the evidence that the private party acted as a government instrument or agent."
"To effect such a transformation, a defendant must prove some exercise of governmental power over the private entity, such that the private entity may be said to have acted on behalf of the government rather than for its own, private purposes. Coolidge,403 U.S. at 488, 89, 91 S.Ct. at 2049." United States v.Koenig, 856 F.2d 843, 849-50 (7th Cir. 1988).
 "While a certain degree of governmental participation is necessary before a private citizen is transformed into an agent of the state, de minimis or incidental contacts between the citizen and law enforcement agents prior to or during the course of a search or seizure will not subject the search to fourth amendment scrutiny. The government must be involved either directly as a participant or indirectly as an encourager of the private citizen's actions before we deem the citizen to be an instrument of the state. . . ."
United States v. Miller, 688 F.2d 652, 657 (9th Cir. 1982), quoting United States v. Walther, 652 F.2d 788 (9th Cir. 1981). The Supreme Court of Hawaii also noted that an indication that an informant is acting for the state is the fact that the police actively recruited the informant. See State v. Boynton,58 Haw. 530, 574 P.2d 1330 (1978).
Capt. May testified at the motion hearing that on March 29, 1988, he received a telephone call from an unidentified female; the caller said that she wanted to provide information on the Sennett murder, but that she wanted to remain anonymous. May told her to call the Crimestoppers telephone number. She did. During the initial conversation, the caller asked May what the police were looking for in regard *Page 288 
to the investigation. May said that the police needed to know the names and addresses of the parties involved and any information about objects taken from the scene of the murder. The caller immediately called the Crimestoppers number and spoke with Investigator Miller. She was assigned the number 569S. This informant told Miller that three people where involved in the murder — Smith, Parker, and Williams — and that the missing VCR, which had been mentioned in a local newspaper article, was in Smith's house. She also told Miller that Parker had taken a knife to Sennett's home and stabbed Elizabeth Sennett. Miller, attempting to corroborate the information, asked the informant for more specific information about the VCR. Miller did not tell 569S to enter Smith's home, nor did he encourage her to do so. The caller told Miller that she would try to get more information. Miller told the informant to call back daily if she had any new information. On March 30, 1988, 569S called and gave police additional information about the missing VCR. She described the VCR, providing the make and model. May testified that the informant was not told to enter Smith's house. The following occurred during the motion hearing to disclose the identity of the confidential informant:
 "Q [Prosecutor]: Did you ever ask her to make an entry into his home to try to get the information for you?
"A [Capt. May]: No, sir, I did not.
 "Q: Did you ever ask her to go out and interview witnesses?
"A: No, sir, I did not.
 "Q: Did you ever direct her specifically to do any acts to obtain information?
"A: No, sir.
 "Q: Did you have an idea from what she told you as to how she was getting the information she was getting to you?
 "A: I just figured as a friend of the family she was talking to them at some point in time.
 "Q: Did you ever at any point during the investigation or during the time she was supplying you information, ask or request that she go out and interview the defendant?
"A: No, sir.
"Q: Or any family member?
"A: No, sir.
 "Q: Did you ever at any point ask her to do anything that you personally felt that you could not legally do yourself?
 "Mr. Singleton [defense counsel]: I am going to object to that as self-serving, conclusory.
"The Court: Overruled.
 "Q: Well, let me ask it this way: You know that there are certain things that you can't legally do during the course of an investigation, is that correct? Even though it might be beneficial to you for the investigation, you know you can't make an illegal entry into a house?
"A: Yes, sir.
 "Q: And you know that you can't commit some crime in order to obtain information, isn't that correct?
"A: Yes, sir.
 "Q: Did you, to your knowledge, ask her to do anything of an unlawful nature in order to obtain information for you?
"A: No, sir, I did not.
 "Q: And as far as her coming to the point where she was an informant and providing information to you, did you do anything initially to seek her out or locate her or to get her to talk, initially?
"A: No, sir."
The record shows that caller 569S was not encouraged to enter Smith's house — she did so of her own free will. Smith failed to meet his burden of establishing *Page 289 
that the informant was acting as an agent for the state. SeeFeffer. The informant was acting as a private citizen; therefore, Smith's Fourth Amendment protections were not violated.
 B.
Smith also argues that the VCR should have been suppressed because, he says, the police exceeded the scope of the search warrant during its execution. The search warrant reads as follows:
 "Proof by affidavit having been made before me this day by Ronnie May, an Investigator for the Colbert County Sheriff's Department, Colbert County, Alabama, that he has probable cause for believing and that he does believe that there is currently contained in the residence of Renea Bryant [Smith's common-law wife] located at 306 North Royal Avenue, Florence, Alabama, a Samsung Video Cassette Recorder, Model VT-311TQ, Serial Number 7020101324.
 "You are therefore commanded to make an immediate search of the above described residence, between the hours of sunrise and sunset, for said videocassette recorder, and if you find the same or any part thereof to bring it forthwith before the Lauderdale County, Alabama District Court."[5]
The record reflects that, when executing the search warrant, officers entered the home and did an initial security search to determine the location of its occupants. May testified that the VCR was recovered within 10 minutes after the search began. Police did open several drawers in the home. Immediately upon recovering the VCR police discontinued their search. The VCR was the only item taken during the search.
 "A search is unreasonable and violates the protections of the Fourth Amendment if it exceeds the scope of the authorizing warrant. U.S. Const. Amend. IV; see Long v. State, 532 S.W.2d 591, 596
(Tex.Crim.App. 1975). While the scope of the search warrant is governed by its terms, the search may be as extensive as is reasonably required to locate items described in the warrant. U.S. Const. Amend. IV; Haynes v. State, 475 S.W.2d 739, 741-42
(Tex.Crim.App. 1971). If the scope of the search is challenged because of the location where the items were found, the officer must show that he was properly in the place where the item was found, either on basis of the search warrant or under the authority of an exception to the warrant requirement. Snider v. State, 681 S.W.2d 60, 62-62
(Tex.Crim.App. 1984); Swink v. State, 747 S.W.2d 53, 54 (Tex.App.-Texarkana 1988, no writ)."
DeMoss v. State, 12 S.W.3d 553, 558 (Tex.App. 1999). See alsoUnited States v. Wuagneux, 683 F.2d 1343 (11th Cir. 1982), cert. denied, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983) and United States v. Rettig, 589 F.2d 418, 423 (9th Cir. 1978) ("The question is whether or not the search that was conducted was confined to the authorization given by the magistrate. In determining whether or not a search is confined to its lawful scope, it is proper to consider both the purpose disclosed in the application for a warrant's issuance and the manner of its execution.").
The warrant stated that police were authorized to search Smith's home for the VCR and "any part thereof," e.g., a remote. Police did not exceed the scope of the warrant.[6] *Page 290 
 VI.
Smith argues that the trial court erred in allowing his confession to be received into evidence. He cites several grounds in support of this contention.
 A.
Smith initially argues that his confession should have been suppressed because, he says, police arrested him at his home without a warrant.
During the suppression hearing Capt. May testified that when the police recovered the VCR in Smith's home, he turned to Smith, read him his Miranda rights and asked him to go to the police station to talk about where he had gotten the VCR. He said that Smith indicated that he would go and Renea Bryant, Smith's common-law wife, said that she wanted to go with him to the police station. May said that he told her to contact someone to come and watch their child. Police waited approximately 20 minutes for someone to come to the residence to take care of the child.
It appears from the record that Smith voluntarily accompanied law-enforcement officers and that he was not under arrest when he went to the police station to answer questions.
Even if we were to conclude that Smith was under arrest when the VCR was recovered, the arrest was lawful and there was probable cause for the arrest; therefore, it did not render Smith's statement inadmissible. As this Court stated in Parker,587 So.2d at 1088, the case involving Smith's codefendant:
 "The appellant maintains that his warrantless arrest at this home was illegal because it was without probable cause. He also argues that because his arrest was illegal, his subsequent statement was inadmissible.
 "In Williams v. State, 565 So.2d 1233, 1236
(Ala.Cr.App. 1990), this Court found that there was probable cause to arrest the appellant's accomplice. `The information obtained from the anonymous telephone informant and corroborated by the sheriff's department satisfied the totality-of-the-circumstances test for determining probable cause set out in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).' Williams, 565 So.2d at 1235. The facts supplying the probable cause for the arrest of Williams, Smith, and the appellant are virtually identical.
 "We find that, based on the specific facts presented in this case, the corroboration of the anonymous telephone informant supplied probable cause for this particular appellant's arrest. See Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301
(1990).
 "In determining the legality of the appellant's arrest, this Court need not decide whether the appellant was actually arrested inside his home or whether any warrantless arrest of the appellant at this home constituted a violation of Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639
(1980). The statements of the appellant were given to Investigator May at the county courthouse. In New York v. Harris, 495 U.S. 14, 110 S.Ct. 1640, 1644-1645, 109 L.Ed.2d 13 (1990), the United States Supreme Court held that `where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of Payton.' Therefore, the appellant's statements at the courthouse would have been admissible even if this Court were to accept the appellant's argument that *Page 291 
he was arrested without a warrant inside his residence."
Smith also argues that his confession should be suppressed because the search of his home was executed without a warrant. Smith's argument is premised on the erroneous conclusion that the search warrant was unlawful because the informant was a state agent. As we discussed in Part V of this opinion, the informant was not acting as a state agent; thus, the Fourth Amendment was not implicated by the informant's actions.
Also, we have reviewed the affidavit in support of the issuance of the search warrant in this case. The affidavit, which consists of six typed pages, is very detailed. It consists of all of the information that the police had been given by caller 569S. The warrant was supported by probable cause. Parker,587 So.2d at 1088.
 B.
Smith also argues that his confession should be suppressed because, he says, it was obtained in violation of Alabama law. Smith argues that his arrest by Colbert County law enforcement officers in Lauderdale County, violated § 15-10-70, Ala. Code 1975. Section 15-10-70 states:
 "When any person charged with the commission of any offense is arrested in any county other than that in which he is triable by an officer of the county in which he is arrested, such arresting officer shall immediately commit him to a jail or guardhouse nearest to the place of arrest, and the sheriff of such county shall at once notify the sheriff of the county in which such person is triable of the fact of such arrest and confinement."
(Emphasis added.) Here, Smith was not arrested by officers in Lauderdale County — the county of his residence. He was arrested by officers of the county where the crime occurred — Colbert County. This section has no application to the arrest in this case because Smith was arrested by officers from the county where the crime occurred. Section 15-10-70 applies to those situations where a person is arrested in a county other than where the crime occurred.
We note that May was not acting alone when he went to the Smith home to execute the search warrant. The search warrant reflects that the warrant was issued in Lauderdale County by a circuit judge for that county. See Rule 3.7(iv), Ala.R.Crim.P. The record also shows that the VCR was recovered by Investigator Charles Ford of the Lauderdale County Sheriff's Department.
Smith also argues that his arrest was unlawful because, he says, he was arrested by a Colbert County officer outside of Colbert County. He cites § 15-10-1 in support of this contention. This issue was addressed by this Court in Larry Reynold Smith v.State, 727 So.2d 147 (Ala.Crim.App. 1998), and determined adversely to the appellant in that case. As the Smith court stated:
 "Historically, officers who could arrest someone in their official capacity without a warrant were limited to the political subdivision of the state where the officer was employed. Ex parte Wallace, 497 So.2d 96 (Ala. 1986); § 15-10-1, Ala.Code. However, in January 1991, the Alabama Rules of Criminal Procedure became effective. These rules were promulgated by the Alabama Supreme Court, pursuant to its rulemaking authority, and were intended to make the practice and procedure for criminal proceedings uniform throughout the state. See Rule 1.1, Ala.R.Crim.P. As concerns any conflict, the rules generally supersede any earlier enacted statutory provision. *Page 292 Prince v. State, 623 So.2d 355 (Ala.Cr.App. 1992); § 12-1-1, Ala. Code, 1975.
 "Specifically applicable here, Rule 3.3(a), Ala.R.Crim.P., provides that `[t]he arrest warrant shall be directed to and may be executed by any law enforcement officer within the State of Alabama.' (Emphasis added.) This rule effectively did away with the requirement that an official may make a legal arrest only in the county or municipality in which the officer is employed. As Justice Maddox noted: `Allowing a "law enforcement officer" to execute a warrant "within the State of Alabama" is a major change in prior practice, in that under § 15-10-1
those officers authorized to make arrests could be made only "within the limits of the county.". . . [T]he Committee determined that the definition of "law enforcement officer" should be a "functional definition." See Committee Comments to Rule 3.3.' H. Maddox, Alabama Rules of Criminal Procedure, Author's Comments, § 3.3 (1990)."[7]
Smith, 727 So.2d at 158. As noted in Smith, § 15-10-1 has been superseded by the adoption of Rule 3.3; therefore, Smith's arrest was lawful.
 VII.
Smith argues that the trial court erred in allowing his statement to be sent to the jury room during deliberations. May testified that he wrote out Smith's confession to police, that Smith read May's rendition, and that Smith then signed the statement. Smith's signed statement was read to the jury during trial and was admitted into evidence.
Rule 22.1, Ala.R.Crim.P., lists the materials that a jury is permitted to take to the jury room. This section states, "Within the exercise of its discretion, the court may permit the jurors, upon retiring for deliberation, to take with them exhibits, writings, and documents that have been received into evidence." This is also specifically provided for in § 12-16-14, Ala. Code 1975. McElroy's Alabama Evidence states:
 "It is the customary, almost invariable, trial court practice to permit the jury, on their retirement to deliberate on the case, to take to the jury room an exhibit which has been placed in evidence. It is provided statutorily that: `All instruments of evidence and depositions read to the jury may be taken out by them on their retirement.' This statute has been interpreted as not requiring ordinarily that an item of demonstrative evidence be taken to the jury room, but, rather, as investing the trial court with measurable discretion to allow or disallow it to go to the jury room. It has been held, for example, that the trial judge has the discretion to allow or disallow a deposition, written testimony or a tape recording to be taken by the jury on retirement."
McElroy's Alabama Evidence, § 10.04(1) (5th ed. 1996).
The record reflects that after the jury had retired but before the exhibits and verdict forms were sent to the jury room, defense counsel objected and asked the trial court to exclude Smith's confession from the exhibits that were being sent to the jury room. A discussion ensued, and the trial court denied Smith's request. *Page 293 
The trial court committed no error. We believe that excluding Smith's confession from all of the other exhibits sent to the jury room would have unduly emphasized it. The trial court did not abuse its discretion here.
 VIII.
Smith argues that evidence of Sennett's suicide should have been excluded because, he argues, it was hearsay evidence that indicated Sennett's consciousness of guilt. He also argues in brief, "The danger in admitting the evidence here was that the jury might readily, albeit improperly, infer from Charles Sennett's admission that Mr. Smith was also guilty of the crime."
However, evidence of Sennett's suicide was not hearsay. "`"Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter."'" Bryant v. State, [Ms. CR-98-0023, November 19, 1999] ___ So.2d ___, ___ (Ala.Crim.App. 1999), quoting James v. State, 723 So.2d 776, 779 (Ala.Crim.App.), cert. denied, 723 So.2d 786 (Ala. 1998).
Without considering other aspects of hearsay, evidence of Charles Sennett's suicide was not offered for the truth of the matter asserted. The State argued at trial that it was offering this evidence to explain Charles Sennett's absence in the investigation and trial. Smith further admits in his brief that there are many reasons why someone might commit suicide and there were several possible explanations in this case.
Moreover, Smith has failed to show any prejudice. Smith argued that evidence of the suicide tended to show his guilt and therefore should not have been admitted at trial. Smith's attorney, in opening statement, devoted much of his remarks to discussing Sennett's guilt and the fact that he had a particularized intent to kill his wife. Smith admitted Charles Sennett's participation in the murder for hire. Based on the record here, admitting evidence of Sennett's suicide did not amount to reversible error. See Richardson v. State,690 S.W.2d 22 (Tex.App. 1985).
Lastly, we agree with the New Jersey Supreme Court, which said, in State v. Feaster, 156 N.J. 1, 68-69, 716 A.2d 395, 428-29
(1998):
 "We find Mills's [accomplices's] suicide to be relevant information properly presented to the jury. In State v. Mann, 132 N.J. 410, 421-23, 625 A.2d 1102 (1993), we observed that a defendant's attempted suicide is generally admitted into evidence. . . .
 "Unlike Mann, this case implicates the suicide of an alleged accomplice and not a defendant's attempt at suicide. The State notes that Mills was not being charged with any crime at the time of his death. Nevertheless, we are satisfied that Mann's
conclusion that a defendant's attempted suicide may be relevant in some circumstances is applicable in this context. See Commonwealth v. Gibson, 547 Pa. 71, 688 A.2d 1152, 1166 n. 30 (1997) (validating prosecutor's mention of co-defendant's suicide, because evidence establishing that suicide had been presented), cert. denied, 522 U.S. 948, 118 S.Ct. 364, 139 L.Ed.2d 284 (1997).
". . . .
 "Having determined that evidence of Mills's suicide was relevant, we also conclude that the information did not unduly prejudice defendant. Under N.J.R.E. 403, relevant evidence may be excluded in the trial court's discretion if its probative value is substantially outweighed by *Page 294 
the risk of undue prejudice. Defendant argues that the suicide, because it may have indicated Mills's guilty conscience, unfairly tarnished defendant in view of the likelihood that the jury would transfer that consciousness of guilt to him. We recognize the plausibility of that inference. However, an equally plausible inference to be drawn from Mills's suicide is that Mills's role in the murder was more significant than the State suggested, thereby lessening the culpability of defendant. Thus, two inferences, one prejudicial to defendant and the other beneficial, could have been drawn from the evidence of Mills's suicide. In view of the substantial evidence presented at trial linking defendant to the crime, we perceive that any prejudice occasioned by the negative inference was minimal. Therefore, taking into account the obvious relevance of the testimony concerning Mills's suicide, we are unable to conclude that the probative value of that evidence substantially was outweighed by the risk of undue prejudice."
 IX.
Smith argues that the trial court's and the prosecutor's reference in the guilt phase of the proceedings to punishment prejudiced him.
 A.
Smith argues that the trial court prejudiced him by giving the following jury instruction:
 "Capital offense is an offense for which the punishment is either life imprisonment without parole or death. It provides that if a defendant is convicted of a capital offense additional proceedings will be held to determine whether his punishment is to be life imprisonment without parole or death. But you are not to concern yourself at this time with any issue of punishment. Instead the only determination you are to make at this time is whether the state has proven beyond a reasonable doubt that the defendant is guilty of the capital offense as it is written out in the indictment or some lesser included offense or offenses which I will instruct you on about later in this charge."
R. 958-59.
This instruction is virtually identical to the pattern jury instruction found in Alabama Pattern Jury Instructions and an instruction that this Court has upheld. Dill v. State,600 So.2d 343 (Ala.Crim.App. 1991), aff'd, 600 So.2d 372 (Ala. 1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684
(1993).
 B.
Smith argues that it was unlawful for the prosecutor to comment on the "impact of the jury's guilt phase determination on sentencing," during the voir dire examination of the jury.
Smith's argument must fail. In a capital case, both the prosecution and the defense have a right to know a juror's views on the death penalty. A prospective juror should be excused from the venire if the juror's views on the death penalty will hinder the ability to follow the instructions of the trial court.Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841
(1985). The prosecutor did not prejudice Smith by mentioning during the voir dire examination of the prospective jurors that a capital offense is an offense punishable by death.
 X.
Smith argues that the trial court committed reversible error in failing to instruct the jury that "independent corroboration of Mr. Smith's custodial statement *Page 295 
to law enforcement officials was required to prove the corpus delicti of capital murder for pecuniary gain."
We have addressed this issue and determined it adversely to Smith. In Bush v. State, 695 So.2d 70, 120 (Ala.Crim.App. 1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969,118 S.Ct. 418, 139 L.Ed.2d 320 (1997), we stated:
 "In a footnote to his brief in his discussion of this issue, the appellant contends that the trial court erred in failing to instruct the jury that it could not convict him absent sufficient evidence to corroborate his confession with respect to each element of the charged offense. This issue was not raised in the trial court. No charge pertaining to the corroboration of the confessions was requested, and no objection was raised to the court's jury charge on this ground. Thus, we review this contention under the plain error rule.
 "`[I]t is the province of the judge to determine whether there is testimony sufficient to make it appear prima facie that the offense has been committed. The evidence on which the judge acts may not necessarily establish the corpus delicti. It may be, and often is, conflicting and contradictory. In such case, the credibility of the witnesses and the sufficiency of the entire evidence are for the ultimate decision of the jury.'
 "McDowell v. State, 238 Ala. 101, 105, 189 So. 183, 185 (1939); Gamble, supra, § 304.01. Here, we have found that the state presented evidence sufficient not only to prove the corpus delicti of murder committed during the course of a robbery or an attempted robbery, but also to make out a prima facie case to be submitted to the jury. The fact that the trial court did not instruct the jury on the law of corpus delicti, under the circumstances here, did not constitute error, much less plain error."
Likewise, we find that there was sufficient evidence to corroborate Smith's confession. The trial court committed no error in failing to instruct the jury on this point of law.
 XI.
Smith argues that the trial court's instructions on the lesser offense of felony murder were misleading and incomplete.
When reviewing a trial court's instruction we apply the following standard:
 "`A trial court has broad discretion in formulating its jury instructions, providing those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 (Ala.Cr.App. 1991). We do not review a jury instruction in isolation, but must consider the instruction as a whole, Stewart v. State, 601 So.2d 491 (Ala.Cr.App. 1992), aff'd in relevant part, 659 So.2d 122 (Ala. 1993), and we must evaluate instructions like a reasonable juror may have interpreted them. Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); Stewart v. State.'"
Griffin v. State, 790 So.2d 267, 332 (Ala.Crim.App. 1999), quoting Ingram v. State, 779 So.2d 1225, 1258 (Ala.Crim.App. 1999). "This court has consistently held that a trial court's oral charge to the jury must be viewed in its entirety and not in `bits and pieces.' Parks v. State, 565 So.2d 1265 (Ala.Cr.App. 1990); Williams v. State, 538 So.2d 1250 (Ala.Cr.App. 1988);Lambeth v. State, 380 So.2d 923 (Ala.), on remand,380 So.2d 925 (Ala.Cr.App. 1979), writ denied, 380 So.2d 926 (Ala. 1980)."Smith v. State, 585 So.2d 223, 225 (Ala.Crim.App. 1991). *Page 296 
 A.
Smith argues that the trial court erred in its instruction on felony murder. Smith's felony-murder charge was based on the underlying felony of assault in the first degree. Though neither party raised the issue, we note that this Court recently held that "felonious assaults that result in the victim's death merge with the homicide and therefore cannot serve as an underlying felony for purposes of the felony-murder rule." Barnett v.State, 783 So.2d 927, 930 (Ala.Crim.App. 2000). Thus, as a matter of law Smith could not be convicted of felony murder.
As we more recently stated, we refuse to find error in an instruction that, as a matter of law, should not have been presented to the jury. See McGriff v. State, 908 So.2d 961
(Ala.Crim.App. 2000).
Moreover, Smith erroneously argues that the trial court's instruction was misleading because, he says, the court's complicity instruction implied that Smith did not have to have a specific intent to kill to be convicted of capital murder. However, the trial court's charge read, in part:
 "If you are convinced beyond a reasonable doubt that the defendant, Kenneth Eugene Smith, committed the crime of murder of the intentional killing type of Elizabeth Dorlene Sennett and that the defendant committed the crime of murder of the intentional killing type for pecuniary or valuable consideration or pursuant to a contract or for hire as alleged in the indictment, then it would be your duty to find the defendant guilty of the capital offense charged in the indictment. The two components of the capital offense are that the defendant, Kenneth Eugene Smith, committed the crime of murder of the intentional killing type and that such murder of the intentional killing type was committed by the defendant for pecuniary or valuable consideration or pursuant to a contract or for hire.
 "A defendant commits murder of an intentional killing type if with intent to cause the death of another person, he causes the death of that other person or of another person.
 "The person acts intentionally with respect to a result or to a conduct when his purpose is to cause that result or to engage in that conduct.
 "The defendant must intentionally as opposed to negligently, accidentally, or recklessly cause the death of the deceased in order to invoke the capital statute. The intent to kill must be real and specific in order to invoke the capital statute.
 "In order to prove the defendant guilty of a particular crime, it is not necessarily required that the state prove that the defendant himself personally committed the acts which constitute the crime. Instead, in certain circumstances the law makes a defendant responsible for the criminal act of another. More specifically the law provides that a defendant is responsible for the criminal acts of another person if the defendant intentionally procured, induced, or caused the other person or persons to commit the acts or if the defendant intentionally aided and abetted another person or person's [in the] commission of the act. The words `aid and abet' include all assistance rendered by acts or words of encouragement or support.
 "I further charge you that if you find that a murder of the intentional killing type, as I have defined that term for you, of Elizabeth Dorlene Sennett was committed by some person other than the defendant, the defendant, Kenneth Eugene Smith, is guilty of that intentional killing type of murder if but only *Page 297 
if you find beyond a reasonable doubt either that the defendant, Kenneth Eugene Smith, intentionally procured, induced, or caused the other person or person to commit the murder and that the defendant, Kenneth Eugene Smith, intentionally aided or abetted the other person or person's commission of the murder. Only if you are convinced beyond a reasonable doubt that either or both of those situations exist as a fact can you find the defendant, Kenneth Eugene Smith, guilty of the intentional killing murder, which he did not personally — which he did not personally commit."
As is evidenced by the above excerpt from the court's oral charge to the jury, the trial court, on more than one occasion, instructed the jury that it must find a specific or particularized intent on the defendant's part before the jury could convict a defendant of capital murder.
Moreover, the instructions were similar to the pattern jury instructions on complicity. The Alabama Supreme Court has recognized that "[i]t is the preferred practice to use the pattern jury instructions in a capital case." State v. Hagood,777 So.2d 214, 219 (Ala.Crim.App. 1999).[8]
Nor, do we agree with Smith's assertion, made during oral argument before this Court, that the trial court's placement of the complicity instruction, immediately after its capital murder instruction, confused the jury and led it to believe that it could apply complicity only to the capital murder charge. At the two instances where the trial court gave a complicity instruction, the trial court prefaced its instruction with the following: "In order to prove the defendant guilty of aparticular crime. . . ." The trial court did not state that complicity applied only to capital murder; indeed its instructions do not even imply such a proposition.
Smith also argues that the trial court failed to distinguish between the intent necessary to commit capital murder and the intent necessary to commit felony murder. We have thoroughly examined both the original jury instructions and the supplemental instructions given to the jury. The trial court followed the pattern jury instructions in giving its instructions on the elements of the two convictions. In regard to the capital murder conviction, the trial court, on more than one occasion, instructed the jury that to be convicted of capital murder the accused must have a specific or particularized intent to kill. In regard to the felony-murder instruction, the trial court instructed the jury that the intent necessary was the intent to commit the underlying felony — not the intent to commit murder. Clearly, the jury was instructed concerning the difference between capital murder and felony murder.
 Penalty-Phase Issues XII.
Smith argues that the trial court's sentence of death should be vacated because, he says, the trial court ignored mitigating factors, failed to consider the jury's recommendation of life imprisonment without parole, and failed to consider certain non-statutory mitigating circumstances that, he *Page 298 
argues, were proven to exist.[9]
 A.
Smith first argues that the trial court erred in considering as aggravating evidence that, by statutory definition, was not aggravating. He asserts that because the trial court stated in its order that the "aggravating circumstances outweigh the mitigating circumstances" (emphasis added) it is clear that the trial court considered more than one aggravating circumstance. However, it is clear from reviewing the order and the trial court's instructions to the jury that this was merely a typographical error in the order.
The trial court, in its order, tracked the list of aggravating circumstances and found only one aggravating circumstance present in the case. The trial court stated the following in its order:
 "The Court finds from the evidence introduced at the trial and reintroduced at the punishment hearing before the jury that the defendant, Kenneth Eugene Smith, committed the murder for pecuniary gain, namely for the sum of $1,000.00. The Court finds that said defendant was, in fact, paid that sum for said intentional killing. The Court finds that this is an aggravating circumstance pursuant to Section 13A-5-49(6) of the Code of Alabama, as amended, and the Court has considered said aggravating circumstance."
Also, the trial court in its instructions to the jury stated that only one aggravating circumstance was to be considered in the case. "Trial judges are presumed to follow their own instructions, and they are presumed to know the law and to follow it in making their decisions." Ex parte Slaton, 680 So.2d 909,924 (Ala. 1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742,136 L.Ed.2d 680 (1997).
Smith also argues that the following portion of the trial court's order reflects that it considered inappropriate aggravating evidence:
 "The Court does find that there is a reasonable basis for enhancing the jury's recommendation sentence for the reasons stated herein that this was a murder for hire and the defendant had the opportunity to reflect and withdraw from his actions and chose not to do this; he was paid for his actions; that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired."
Clearly, the above-quoted portion of the order reflects that the trial court placed more weight on the fact that this was a case of murder for hire than did the jurors. The weight to be attached to the aggravating and the mitigating evidence is strictly within the discretion of the sentencing authority. As this Court stated in Bush, 695 So.2d at 94, quoting Clisby v.State, 456 So.2d 99, 101 (Ala. *Page 299 
Crim.App.), on remand, 456 So.2d 102 (Ala.Crim.App. 1983), aff'd,456 So.2d 105 (Ala. 1984), cert. denied, 470 U.S. 1009,105 S.Ct. 1372, 84 L.Ed.2d 391 (1985):
 "`[T]he sentencing authority in Alabama, the trial judge, has unlimited discretion to consider any perceived mitigating circumstances, and he can assign appropriate weight to particular mitigating circumstances. The United States Constitution does not require that specific weights be assigned to different aggravating and mitigating circumstances. Murry v. State, 455 So.2d 53 (Ala.Cr.App. 1983), rev'd on other grounds, 455 So.2d 72 (Ala. 1984). Therefore, the trial judge is free to consider each case individually and determine whether a particular aggravating circumstance outweighs the mitigating circumstances or vice versa. Moore v. Balkcom, 716 F.2d 1511 (11th Cir. 1983). The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation.'"
 B.
Smith argues that the trial court minimized the jury's role in sentencing by his reference to the jury's recommendation as a "mitigating factor."
It is clear from a review of the sentencing order that the trial court considered the jury's recommendation. The trial court stated: "The Court does find that the jury's recommendation is a mitigating factor and the Court has considered said factor at this sentencing hearing."
Moreover, we do not agree with Smith that the trial court erred in finding the jury's recommendation to be a nonstatutory mitigating factor. The Supreme Court recently approved a trial court's finding that the jury's recommendation was a mitigating circumstance. See Ex parte Burgess, 811 So.2d 617 (Ala. 2000). See also, Carroll v. State, 852 So.2d 801 (Ala.Crim.App. 1999). As this Court stated in Carr v. State, 640 So.2d 1064, 1074
(Ala.Crim.App. 1994):
 "The trial court's sentencing order reflects that the court gave `consideration to the recommendation of the jury in its advisory verdict that the defendant be sentenced to life without parole.' R. 65. The court, however, after independently weighing the aggravating and mitigating circumstances, determined that the aggravating circumstance outweighed the mitigating circumstances and chose not to accept the jury's recommendation. Constitutional and statutory provisions require no more."
"The trial court must consider the jury's sentencing recommendation, but that recommendation is not binding." Exparte Roberts, 735 So.2d 1270 (Ala.), cert. denied,538 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). The trial court followed the law. It considered the jury's recommendation but chose to override it. The court weighed the aggravating and the mitigating circumstances. The trial court complied with its legal obligation.
 XIII.
Smith further argues that the trial court failed to consider certain mitigating evidence.
 A.
First, Smith argues that the trial court erred in not adequately considering his age as a mitigating factor. However, this argument is not supported by the trial court's order. The order states:
 "The Court finds 2 statutory mitigating circumstances in this cause and that *Page 300 
is the age of the defendant at the time of the commission of the crime in that he was 22 years of age. However, the Court does find from the evidence that the defendant was normal and not retarded, had attended high school and worked several jobs, was married and had one (1) minor child."
The trial court found Smith's age to be a mitigating circumstance; however, it is clear that the court assigned it little weight in its analysis.
Smith contends that the order states that the trial court took into account, in not considering age to be a mitigating factor, the fact that the Smith was not mentally retarded. However, it is clear that the judge considered Smith's mental maturity. A consideration of the mental maturity of an individual necessarily would take into account whether the individual is mentally retarded. This was an appropriate consideration for the trial court in determining whether Smith's age was a statutory mitigating circumstance. Certainly, the fact that Smith had held several jobs, had a steady relationship and had a child as a result of that relationship was more than sufficient for the trial court to find that Smith's age, though mitigating, was entitled to little weight.
 B.
Smith also argues that the trial court erred in not finding as a mitigating circumstance that Smith had a difficult childhood. However, Smith's assertion is not supported by the record. The trial court stated the following in its order:
 "The Court further finds as a non-statutory mitigating factor, that the defendant was neglected and deprived in his early childhood."
The trial court did state later in the order that it did not find that Smith's childhood was a mitigating factor. However, the trial court has corrected its order to reflect that it did find Smith's childhood to be a mitigating factor but that it gave that mitigating circumstance little weight. The weight to attach to a mitigating circumstance is within the province of the sentencer. See Bush, supra.
 XIV.
Last, as required by § 13A-5-53, Code of Alabama 1975, this Court will address the propriety of Smith's conviction for capital murder and his sentence to death by electrocution. Smith was indicted and convicted of murder defined as capital by §13A-5-40(a)(7), i.e., murder done for "a pecuniary or other valuable consideration or pursuant to a contract or for hire."
The record reflects that Smith's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(1).
Smith argues that the trial court did not adequately evaluate the aggravating circumstances and the mitigating circumstances and that its order is deficient for that reason. We do not agree. The record shows that the trial court found that only one aggravating factor had been proven — that the murder was done for a pecuniary gain. The fact that this aggravating factor is also an element of the capital offense does not make this finding unlawful. This Court has approved of the practice of "double counting," that is, counting an element of the offense as an aggravating circumstance. See Burton v. State, 651 So.2d 641
(Ala.Crim.App. 1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995). The court reviewed all the evidence offered in mitigation and found the following statutory mitigating evidence: *Page 301 
 "The Court now proceeds to consider the mitigating circumstances as set out and enumerated in Section 13A-5-51 of the Code of Alabama, as amended, and other mitigating circumstances proved at the punishment hearing before the jury.
 "The Court finds 2 statutory mitigating circumstances in this cause and that is the age of the defendant at the time of the commission of the crime in that the was 22 years of age. However, the Court does find from the evidence that the defendant was normal and not retarded, had attended high school and worked several jobs, was married and had one (1) minor child.
 "The Court finds the defendant had no significant history of prior criminal activity.
". . . .
 "The Court further finds that the capital offense was not committed while the defendant was under the influence of extreme mental or emotional disturbance, accordingly the Court does not consider the mitigating circumstance listed in Section 13A-5-51(2), Code of Alabama, the Court finding that said mitigating circumstance does not exist in this case.
 "The Court further finds from the evidence that the victim was not a participant in the defendant's conduct or consented to it; therefore, the Court finds that the mitigating circumstance listed in Section 13A-5-51(3) Code of Alabama, does not exist and the Court does not consider it.
 "The Court does not find from the evidence that the defendant was an accomplice in a capital offense committed by another person and that his participation was relatively minor. The Court finds from the evidence in this case that the defendant, Kenneth Eugene Smith, and John Forrest Parker both killed the victim by beating and hitting her with different objects and stabbing her while the victim was pleading with them. Therefore, the Court finds that the mitigating circumstance listed in Section 13A-5-51(4), Code of Alabama, does not exist and the Court does not consider it.
 "The Court does not find from the evidence that the defendant acted under extreme duress or under the substantial domination of another person; therefore, the Court finds that the mitigating circumstance listed in Section 13A-5-51(5), Code of Alabama, does not exist and the Court does not consider it.
 "The Court does not find from the evidence that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; the Court had evidence before it regarding the defendant's actual actions during and after the murder of Elizabeth Dorlene Sennett which demonstrate that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was not substantially impaired. The defendant's actions in throwing away the murder weapons after the killing, his attempting to make it look like a burglary, and other evidence that was presented, is all evidence that his conduct was criminal, and that he might be apprehended and for that reason did what he could to avoid apprehension. Accordingly, the Court finds that the mitigating circumstance listed in Section 13A-5-51(6), Code of Alabama, does not exist and the Court does not consider it."
The trial court found the following nonstatutory mitigating evidence:
 "The Court further finds as to a non-statutory mitigating [circumstances], *Page 302 
that the defendant appeared to be remorseful for what he had done, and he gave a voluntary confession. However, the defendant did not turn himself in to the police and at the time of his arrest in his home in Florence, Alabama, there was found in his home a VCR that was property of the victim with blood still on it.
 "The Court further finds as a non-statutory mitigating [circumstance], the defendant's good conduct in jail; and in counseling others including family members.
 "During his tenure in the Colbert County Jail, Tuscumbia, Alabama, he warned a jail-guard of an impending breakout of jail by other inmates. The jail-guard, Alton Hankins, testified to this. While in prison with the Board of Corrections, he has adjusted and up-graded his education and counseled other people.
 "The Court further finds as a non-statutory mitigating factor, that the defendant was neglected and deprived in his early childhood."
The trial court weighed the aggravating and the mitigating circumstances, overrode the jury's recommendation of life imprisonment without parole, and sentenced Smith to death. We agree with the trial court's findings in this case; his findings are more than adequately supported by the record. The trial court's order is not deficient.
Pursuant to § 13A-5-53(b)(2), this Court must independently weigh the aggravating circumstances and the mitigating circumstances to determine the propriety of Smith's death sentence. After an independent weighing, this Court is convinced, as was the trial court, that Smith's sentence of death is the appropriate sentence in this case.
Section 13A-5-53(b)(3) also provides that we must address whether Smith's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. Smith's sentence, when compared, is neither disproportionate or excessive. See Griffin v. State, 790 So.2d 267 (Ala.Crim.App. 2000); Sockwell v. State, 675 So.2d 4 (Ala.Crim.App. 1993), aff'd, 675 So.2d 38 (Ala. 1995), cert. denied, 519 U.S. 838,117 S.Ct. 115, 136 L.Ed.2d 67 (1996); and Parker v. State,587 So.2d 1072 (Ala.Crim.App. 1991), on remand, 610 So.2d 1171
(Ala.Crim.App.), aff'd, 610 So.2d 1181 (Ala. 1992), cert. denied,509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993).
Last, we have searched the entire record for any error that may have adversely affected Smith's substantial rights and have found none. Rule 45A, Ala.R.App.P.
Smith's conviction and sentence of death by electrocution are due to be, and are hereby, affirmed.
AFFIRMED.
LONG, P.J., and COBB, BASCHAB, and FRY, JJ., concur.
[1] This appeal is from Smith's second conviction for capital murder. Smith's first conviction was reversed on appeal because of a Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1986), violation. Smith v. State, 588 So.2d 561
(Ala.Crim.App. 1991), after remand, 620 So.2d 727
(Ala.Crim.App.), on remand, 620 So.2d 732 (Ala.Crim.App. 1992). Smith was retried in April 1996 and again convicted of capital murder.
[2] Billy Gray Williams was also convicted for the capital murder of Elizabeth Sennett. He was sentenced to life imprisonment without the possibility of parole. His conviction was affirmed by this Court. Williams v. State, 565 So.2d 1233
(Ala.Crim.App. 1990).
[3] John Forrest Parker was also convicted of capital murder and sentenced to death by electrocution. His conviction was affirmed on direct appeal. Parker v. State, 587 So.2d 1072
(Ala.Crim.App. 1991), on remand, 610 So.2d 1171 (Ala.Crim.App.), aff'd, 610 So.2d 1181 (Ala. 1992), cert. denied, 509 U.S. 929,113 S.Ct. 3053, 125 L.Ed.2d 737 (1993). The denial of his petition for postconviction relief was also affirmed by this Court, without an opinion. Parker v. State, 768 So.2d 1020
(Ala.Crim.App. 1999) (table), cert. denied, 780 So.2d 811 (Ala. 1999) (table).
[4] This information had not been disclosed to the media.
[5] Smith and Bryant lived together at Royal Street with their two-year-old son.
[6] We note that during Smith's first trial he did not challenge the search of the house and seizure of the VCR.
[7] Smith was arrested in 1988, before the adoption of Rule 3.3, Ala.R.Crim.P., which provides that an arrest warrant may be executed by any law-enforcement officer in the state. However, Rule 1.5, Ala.R.Crim.P., provides: "These rules shall govern all criminal proceedings, without regard to when the proceeding was commenced."
[8] The Supreme Court has cautioned that there will be instances when the giving of a pattern jury instruction may constitute plain error, i.e., where the instruction was misleading or inapplicable to the facts in a given case. See Exparte Wood, 715 So.2d 819 (Ala.), cert. denied, 525 U.S. 1042,119 S.Ct. 594, 142 L.Ed.2d 536 (1998). We do not have that situation here. No one disputes the fact that a complicity instruction was necessary in this case.
[9] The record reflects that the trial court amended its original sentencing order. Rule 29, Ala.R.Crim.P., states:
 "Clerical mistakes in judgments, orders, or other parts of the record, and errors arising from oversight or omission may be corrected by the court at anytime of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal or thereafter, such mistakes may be so corrected by the trial court. Whenever necessary, a transcript of the record as corrected may be certified to the appellate court in response to a writ of certiorari or like writ, in conformity with Rule 10(f), A.R.App.P."
Here, the trial court corrected its original order to rectify some omissions from the original order. The trial court had the authority to so amend the order.